# CHARGE OF DISCRIMINATION

| | CHARGE NUMBER |
|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.  ☐ FEPA   ☒ EEOC | 520-2006-00075 |

_____ and EEOC
*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Majid Borumand | 212-204-7311 |

| STREET ADDRESS   CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 310 E. 46th Street, Apt. 22L, New York, New York 10017 | 12/16/61 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Merrill Lynch & Co., Inc. | 50,000+ | 609-274-6855 |

| STREET ADDRESS   CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 1600 Merrill Lynch Drive, Pennington, New Jersey 08534 | Mercer |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS   CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE   ☐ COLOR   ☐ SEX   ☒ RELIGION   ☐ AGE
☒ RETALIATION   ☒ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)   LATEST
                      08/01/05

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s))*:

SEE ATTACHED AFFIDAVIT OF CHARGING PARTY MAJID BORUMAND

RECEIVED JAN 06 2006
EEOC-NYDO-ENFORCEMENT

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

Date _____ Charging Party *(Signature)*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(Day, month, and year)*
04/01/06

ANTHONY G. MANGO
Notary Public, State of New York
No. 02MA5025980
Qualified in Nassau County
Commission Expires April 4, 2006

EEOC FORM 5 (Test 10/94)

## AFFIDAVIT OF CHARGING PARTY MAJID BORUMAND

STATE OF NEW YORK  )
                   )
COUNTY OF NEW YORK )    ss.:



MAJID BORUMAND, being duly sworn, deposes and says:

1. I am a forty-three (43) year old male Iranian National. I worked for Merrill Lynch & Co., Inc. ("Merrill") as a Vice President in the Global Markets division from my hiring, in March 2002, through my termination as of August 1, 2005. I worked at Merrill's offices located at 3 World Financial Center, located in New York City, New York. For the reasons set forth herein, I believe that my termination was motivated by unlawful discrimination based upon my religion and national origin, as well as retaliation against my prior complaints of discrimination.

2. I hold a PhD in Theoretical Physics and a Masters Degree in Mathematical Finance. I was hired by Mr. Kishor Laud to work in Merrill's Global Markets division as a Vice President performing the function of a Quantitative Analyst (Quant). Initially, I was placed in a group consisting of three (3) employees, including myself, Ms. Olga Lubovitsky and Mr. Jack Luo, all of whom had doctorate degrees. After approximately 18 months, Ms Lubovitsky moved to the Fixed Income division of the firm assuming a Quant role for a higher salary. Shortly after that, Mr. James Gatheral, a Managing Director and the head of the Quantitative Analyst group (hereinafter referred to as "Group B"), decided to merge his group with Mr. Laud's group (hereinafter referred to as "Group A"). As a result, Mr. Laud and Mr. Luo joined group B and I was left behind as the only surviving Quant with a PhD degree in Group A, a group that was not well defined at this point due to the departures of Lubovitsky, Laud, and Luo. Indeed, the only

reason for its existence at this point was to bar me from joining the Gatheral group (Group B).

3. The decision by management to leave me behind in Group A was purely for the purpose of "justifying" a lower pay scale for me, since I did not perform any work within Group A, but rather, worked as a Quantitative Analyst with other Quantitative Analysts in "Group B". Simply put, I worked in Group B, exclusively attended their weekly meetings and was supervised by Managers within Group B, but was paid out of Group A and listed in Merrill's headcount rolls in Group A. This was a classic case of form over substance, solely motivated by discrimination against my religion and nationality.

4. Throughout my tenure at Merrill, I complained about my continued placement in Group A, which had the effect of reducing my income by substantial margins. Over the course of my three (3) year employment at Merrill, this disparity in income was on average more than $120,000.00 per year. However, despite my verbal and written complaints about this discriminatory treatment, nothing was done to rectify the situation.

5. Although I was a Quantitative Analyst (a "Quant"), and performed work for the traders in the Global Markets division, I was prohibited from sitting on the trading floor with my peers – the other Quants in Group B. In fact, I was the sole Quant responsible for the development of software and financial mathematics of the convertible bond model, including the support of its clients (convertible bond trading desk), yet I was forced to sit on the ninth floor, which housed the municipal bond trading desk, while the convertible bond traders and other Quants were sitting on the fifth floor of the building.

6. Although I questioned this senseless seating arrangement time and time again, I was ignored and eventually retaliated against by being terminated. This 'isolation' created an impasse which directly affected my prospects for career advancement, since I did not have the

valuable 'face time' with the traders and other employees that is needed for advancement in the field. Indeed, although I reported only to managers in Group B, attended weekly meetings of Group B only, was included primarily in Group B's email alias (GED_MODELDEV) and had my performance evaluated out of Group B, nevertheless I was the only Quant not permitted to sit on the trading floor with my peers in Group B, and the only Quant with a PhD degree in Group B that was paid from outside of the group. There I was sitting on a different trading floor (municipal bonds), in isolation (a prelude to my termination) next to a *contract* employee with only a *high school degree* who was exclusively performing IT tasks, along with other employees who were providing PC support for the Municipal bonds group. This outrageous arrangement was simply intended to physically isolate me from my clients and the rest of my peers and in anticipation of my future termination.

7. The unreasonable rules and restrictions placed upon me by management at Merrill were motivated by unlawful discrimination against my religion and national origin, which manifested itself on several occasions in the form of derogatory comments directed at me.

8. James Gatheral, a Managing Director at Merrill and my manager for most of my tenure there, at one point asked me, "Majid, how can we trust you?" "How do we know that you are a nice guy – maybe you read the Koran and get ideas?" On another occasion, Mr. Gatheral was hypothetically discussing who could be cut from the group, if necessary, and he stated the following in the weekly Quant group meetings (Group B): "Quants are like Israelis and Traders are like Palestinians. There are just so many Palestinians, but Israelis are limited. We cannot afford losing Quants compared to Traders in the same way that we cannot afford losing Israelis compared to Palestinians."

9. On another occasion, with respect to my ban from the trading floor, I was told,

"the reason you are not allowed on the trading floor is because you are from a country that has a high risk factor and is a threat." I was also told by Kishor Laud not to walk around the trading floor (5th floor), since "people get scared nowadays."

10. On other occasions, I was told that I was under "scrutiny," because of my national origin, and I overhead two colleagues stating that there was "sensitivity" with regard to my employment at Merrill.

11. On one occasion I was threatened that the "FBI will have you deported" and was asked whether I was "planning to bomb an airplane."

12. These examples highlight the culture of bigotry within the division in which I worked while at Merrill. It is worth noting that I was the only Iranian and the only Muslim in the group, and I was ostracized because of this reality.

13. In addition to the obvious manifestation of discrimination in the form of derogatory comments directed at me, I was also subjected to more subtle forms of discrimination, which had the effect of holding me back from advancing in my career. For example, the direct discriminatory policy of prohibiting me from sitting on the trading floor with my peers impacted on my ability to build relationships with clients of the firm and gain valuable 'face time' with the traders, both of which are vitally important to succeed in my field.

14. Despite my complaints of discriminatory treatment to management at Merrill, more specifically to Kishor Laud, nothing was done to rectify the issues. In fact, the culture within my group at Merrill only fostered the discrimination, from the top on down. The situation actually deteriorated during my last three (3) months of employment, while I was under the supervision of Yonathan Epelbaum, who succeeded James Gatheral as head of Group B.

15. Mr. Epelbaum, an Israeli National, severed the lines of communication, refusing

to directly address me let alone speak with me. At our weekly Group B Quant meetings, during which everyone would present their reports, Mr. Epelbaum would proceed around the table in alphabetic order. However, I was always the last one Mr. Epelbaum would hear from even though neither my first or last name would fall in that order. There was no justifiable reason for this treatment other than discrimination. It was humiliating.

16.     On occasions when I would complain to my direct managers, Kishor Laud and Jining Han, their advice to me was "you're barking up the wrong tree – talk to Yoni [Epelbaum]." However, despite numerous emails and telephone calls to Mr. Epelbaum, he refused to speak with me. It was no coincidence that just three (3) months after Epelbaum assumed the Managing Director duties of the group from James Gatheral, I was terminated, effective August 1, 2005.

17.     On or about June 25, 2005, I was informed by Sue Ann Hannigan, the Director of Human Resources at Merrill that I was terminated due to my position being "eliminated." I was also told that my termination had "nothing to do with my performance," but that I was an unfortunate victim of a reduction in force at Merrill. I questioned the reduction in force theory, since I knew that Merrill was hiring at the time(Merrill hired a net of more than 2000 employees between 9/2004 and 7/2005 and many more after 7/2005), and I informed Ms. Hannigan that I believed my termination was due to unlawful discrimination based on my national origin and religion. I also quoted to her the statements made by Mr. Gatheral and the others indicating suspicion towards me. At one point Ms. Hannigan became visibly upset and mentioned she has spent most of her career stopping these things from happening and stated that I could "sue Merrill" if I believed this to be the case.

18.     Since my termination from Merrill, I have reason to believe that Merrill has

retaliated against me, by providing poor references of my performance to prospective employers. This unlawful retaliation has further stymied my efforts to continue with my career with a different employer.

_____
Majid Borumand

Sworn to and subscribed to before
me this  4th  day of January, 2006

_____
Notary Public

ANTHONY G. MANGO
Notary Public, State of New York
No. 02MA5025980
Qualified in Nassau County
Commission Expires April 4, 2006