ANTHONY G. MANGO
MANGO & IACOVIELLO, LLP
14 Penn Plaza, Suite 2200
New York, New York 10122
212-695-5454
212-695-0797 facsimile

JEFFREY L. LIDDLE
JAMES R. HUBBARD
MICHAEL E. GRENERT
LIDDLE & ROBINSON, L.L.P.
800 Third Avenue
New York, New York 10022
212-687-8500
212-687-1505 facsimile

Attorneys for Plaintiff-Intervenor Majid Borumand

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                       Plaintiff,

      v.

MERRILL LYNCH & CO., INC., and
MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED,

                     Defendants.

------------------------------------------------------------X

MAJID BORUMAND,

                     Plaintiff-Intervenor,

      v.

MERRILL LYNCH & CO., INC., and
MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED,

                     Defendants.

------------------------------------------------------------X

07-Civ-6017 (DAB) (KNF)
(ECF Case)

**AMENDED COMPLAINT OF**
**PLAINTIFF-INTERVENOR**
**MAJID BORUMAND**

**JURY TRIAL DEMANDED**

RECEIVED FEB 2 2 2008 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff-Intervenor, Majid Borumand ("Mr. Borumand" or "plaintiff"), as and for his complaint, by his attorneys, Mango & Iacoviello, LLP and Liddle & Robinson, L.L.P., alleges as follows:

## NATURE OF ACTION

1.     This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and Title I of the Civil Rights Act of 1991, 42 U.S.C. §1981a, as amended ("Title VII"), The New York State Human Rights Law, McKinney's Executive Law §§290 *et seq.* ("NYSHRL"), and The New York City Human Rights Law, Administrative Code of the City of New York §§8-101 *et seq.* ("NYCHRL"), for unlawful employment discrimination against plaintiff on the basis of national origin (Iranian) and religion (Muslim), and unlawful retaliation for complaints by plaintiff about such discrimination.  As alleged with greater detail herein, Defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("defendants") discriminated against Mr. Borumand by treating him differently than non-Iranian/non-Muslim employees in the terms and conditions of his employment, including his compensation and job title, the location of his work station, and the termination of his employment, which was also in retaliation for his complaints about this unlawful discrimination.

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and §1343, conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e-5(f)(1) and (3) and §2000e-6 ("Title VII"), and pursuant to Section 102 of The Civil

Rights Act of 1991.  The Court's supplemental jurisdiction of claims arising under the human rights laws of New York State and New York City is invoked under 28 U.S.C. §1367.

3.      Venue herein is proper under 28 U.S.C. §1391(b), and 42 U.S.C. §2000e-5(f)(3) as all acts complained of occurred within the Southern District of New York.

## THE PARTIES

4.      Mr. Borumand is a Muslim, Iranian citizen.  He has been lawfully present in the United States for approximately seventeen years since 1990, and currently is seeking permanent residency.

5.      Defendants, Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, a subsidiary of Merrill Lynch & Co., Inc. (hereinafter collectively "Merrill Lynch" or "defendants"), are Delaware corporations doing business in the Southern District of New York and are subject to the jurisdiction of this Court.  Defendants are employers within the meaning of Title VII, 42 U.S.C. §2000e(b), the NYSHRL, and the NYCHRL.

## FACTS

6.      In or about January 2002, defendants hired Mr. Borumand as a Vice President Quantitative Analyst (Quant).

7.      In or about February 2002, defendants filed an I-129 Petition for a Nonimmigrant Worker on behalf of Mr. Borumand, listing his position as "VP/Quantitative Analyst."  In doing so, defendants averred that the duties of a Quantitative Analyst required, at a minimum, a Master's in Mathematics or a similar degree, and that no American was available who met the job requirements.

8.      Mr. Borumand holds a Ph.D. degree in Theoretical Physics and a Master's degree in Mathematical Finance from the University of Wisconsin-Madison.

9.      Throughout his employment by defendants, Mr. Borumand was subjected to numerous derogatory, discriminatory comments directed at his national origin and religion, which fostered a hostile environment.

10.     James Gatheral, a Managing Director and Head of the Quant group for defendants and Mr. Borumand's manager for most of his tenure with defendants, at one point asked Mr. Borumand "Majid, how can we trust you?  How do we know that you are a nice guy – maybe you read the Koran and get ideas."

11.     On another occasion, Gatheral, while hypothetically discussing who might be cut from the group if necessary, stated the following in the weekly Quant group meetings that Mr. Borumand regularly attended:  "Quants are like Israelis and Traders are like Palestinians.  There are just so many Palestinians, but Israelis are limited.  We cannot afford losing Quants compared to Traders the same way we cannot afford losing Israelis compared to Palestinians."

12.     On yet another occasion, when Mr. Borumand questioned his prohibition from the trading floor, he was told, "the reason you are not allowed on the trading floor is because you are from a country that has a high risk factor and is a threat."

13.     Mr. Borumand was told by his supervisor, Kishor Laud, that he should not walk around the trading floor because "people get scared nowadays."

14.     Another time, Mr. Borumand was told that he was under "scrutiny" because of his national origin, and he overheard two colleagues discussing the fact that there was "sensitivity" with regard to Mr. Borumand's employment with defendants.

15.     On another occasion, Mr. Borumand was taunted by a colleague that the "FBI will have you deported" and he was asked, "are you planning to bomb an airplane?"

16.    Throughout Mr. Borumand's entire tenure with defendants, defendants unlawfully discriminated against Mr. Borumand on account of his national origin and religion with respect to his compensation, job title, and location of his work station.

17.    Throughout Mr. Borumand's entire tenure working for defendants, Mr. Borumand performed Quantitative Analyst work related to the development and enhancement of models for defendants' convertible bond trading activities.

18.    Despite the fact that Mr. Borumand was hired by defendants as a Quantitative Analyst and performed the work of a Quantitative Analyst, and that defendants listed his position as 'VP/Quantitative Analyst' in its Petition to the federal government for a work visa for Mr. Borumand and averred that the duties of a Quantitative Analyst required, at a minimum, a Master's in Mathematics or a similar degree, and that no American was available who met the job requirements, defendants internally categorized Mr. Borumand for headcount/payroll purposes as a Senior Programmer (technology worker) in the model/analytics development group of the technology group as a means to try to justify a lower pay grade for him, since technology employees are typically paid substantially less than Quantitative Analysts. Moreover, defendants did not even compensate Mr. Borumand as well as others in the model/analytics development group of the technology group, much less Quantitative Analysts.

19.    In late 2003 and early 2004, all of the employees in the model/analytics development group of the technology group who performed similar functions to Mr. Borumand were formally "promoted" to join the Quantitative Analysts (Quant) group. These individuals' work locations were moved to where other Quants were located, and were seated on the trading floor where the traders with whom they worked were located. Despite the fact that these individuals were Mr. Borumand's co-workers and peers, he was the only one who was denied

this formal "promotion." Moreover, Mr. Borumand was prohibited from sitting on the trading floor with his peers, despite the facts that the other Quants were seated on the trading floor and that the work he performed was quantitative analysis related to the work conducted by the convertible bond traders who used his work product on the trading floor. Mr. Borumand was left isolated as the only employee in the model/analytics development group of the technology group other than a recently hired temp/consultant who, unlike Mr. Borumand, did not perform the work of a Quantitative Analyst and had not earned a college degree, much less a Master's and Ph.D. as Mr. Borumand had. Nevertheless, Mr. Borumand continued to perform duties of a convertible bond Quant, and was supervised by, reported to, and had his performance reviewed by the managers of the Quant group.

20.    On numerous occasions during Mr. Borumand's tenure with defendants, he complained to his superiors, including but not limited to Laud and Gatheral, about the discriminatory treatment he was subjected to, including defendants' failure to officially categorize him as a Quant for payroll purposes, which had the effect of reducing his income by substantial margins, as well as his work location apart from the other Quants and apart from the traders.

21.    However, nothing was done by defendants to rectify the situation. Instead, in response to Mr. Borumand's complaints, he was subjected to continued unequal treatment in the terms and conditions of his employment with defendants, including but not limited to in his compensation and work location and by discriminatory comments.

22.    In or about April 2005, Gatheral was replaced by Yoni Epelbaum as Managing Director of the Quant group. Under Epelbaum, an Israeli citizen, defendants' discriminatory treatment of Mr. Borumand continued.

23.    Epelbaum refused to speak with Mr. Borumand outside of Quant group meetings, cancelled prescheduled meetings with him, and marginalized and failed to recognize his contributions to the Quant group. For example, during the weekly Quant group meetings in which everyone would report to Epelbaum in alphabetical order, Mr. Borumand would be called upon last even though he was not last alphabetically. There was no justifiable reason for this treatment other than discrimination, and it had the effect of humiliating Mr. Borumand.

24.    Mr. Borumand complained to Laud and another supervisor about his treatment by Epelbaum, but was told: "you are barking up the wrong tree. Talk to Yoni [Epelbaum]. Mr. Borumand attempted to communicate with Epelbaum about these issues, but Epelbaum refused to speak with Mr. Borumand about them.

25.    Ultimately, on or about June 25, 2005, only about three months after Epelbaum took over as manager of the Quant group, Mr. Borumand was informed that he was being terminated from defendants' employ.

26.    Mr. Borumand was told that his position was "eliminated" as part of a "reduction in force," despite the fact that defendants were actually in a hiring phase at the time, actively recruiting Ph.D.s in general and Quantitative Analysts in particular for employment.

27.    While Merrill Lynch terminated the employment of Mr. Borumand, it retained the temp/consultant member of the technology group and made him an official member of the Quant group despite the fact that he did not even have a college degree, much less a Master's degree or Ph.D. as did Mr. Borumand. Mr. Borumand holds a Ph.D. degree in Theoretical Physics and a Master's degree in Mathematical Finance from the University of Wisconsin-Madison.

28.    Mr. Borumand complained to defendants' Human Resources department that he believed that the termination of his employment was due to discrimination based on his national origin and religion.

29.    Upon information and belief, defendants provided poor references regarding Mr. Borumand to prospective employers in retaliation for his complaints about discrimination.

30.    Defendants discriminated against Mr. Borumand on the basis of his national origin, Iranian, and his religion, Muslim in the terms and conditions of his employment, including by making numerous discriminatory comments, failing to pay him compensation equal to that of his peers, make him an official member of the Quant group, and terminating his employment, and retaliated against him for his complaints of discrimination.

31.    The unlawful practices complained of above were intentional, and were committed by defendants with malice and/or reckless indifference to Mr. Borumand's legally protected rights of equal employment.

32.    On January 6, 2006, Mr. Borumand filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission, a copy of which is annexed hereto as Exhibit 1.

33.    After its investigation concluded, the EEOC issued a Determination Letter, on September 12, 2006, finding that "[Merrill Lynch] subjected [Mr. Borumand] to discrimination based on his race and religion and retaliated against him." A copy of the EEOC's Determination Letter is annexed hereto as Exhibit 2.

34.    After attempts by the EEOC to conciliate the matter were unsuccessful, the EEOC filed a Complaint in this Court on June 26, 2007. A copy of the EEOC's complaint is annexed hereto as Exhibit 3.

35.    Mr. Borumand has satisfied all administrative filing requirements and prerequisites to the filing of this action pursuant to Title VII, the NYSHRL and NYCHRL, prior to commencing this action.

## FIRST CLAIM FOR RELIEF

### (National Origin Discrimination In Violation Of Title VII)

36.    Plaintiff hereby realleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 35 above.

37.    Defendants intentionally discriminated against Mr. Borumand on account of his national origin in violation of Title VII and The Civil Rights Act of 1991, 42 U.S.C. §1981a, as amended (hereinafter "The Civil Rights Act of 1991"), by denying Mr. Borumand equal terms and conditions of employment and by terminating his employment.

38.    Defendants' acts of discrimination were performed with malice and reckless indifference to Mr. Borumand's protected civil rights.

39.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand suffered emotional harm, embarrassment, pain and suffering, humiliation and harm to his reputation.

40.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand has suffered and continues to suffer substantial losses of past and future earnings, and other benefits associated with his former employment.

## SECOND CLAIM FOR RELIEF

### (National Origin Discrimination In Violation Of The NYSHRL)

41.    Plaintiff hereby realleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 40 above.

42.    Defendants intentionally discriminated against Mr. Borumand on account of his national origin in violation of NYSHRL, McKinney's Executive Law §296(1)(a), by denying him equal terms and conditions of employment and by terminating his employment.

43.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand suffered emotional harm, embarrassment, pain and suffering, humiliation and harm to his reputation.

44.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand has suffered and continues to suffer substantial losses of past and future earnings, and other benefits associated with his former employment.

## THIRD CLAIM FOR RELIEF

### (National Origin Discrimination In Violation Of The NYCHRL)

45.    Plaintiff hereby realleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 44 above.

46.    Defendants intentionally discriminated against Mr. Borumand on account of his national origin in violation of NYCHRL, New York City Administrative Code §§8-107 *et seq.*, by denying him equal terms and conditions of employment and by terminating his employment.

47.    Defendants' acts of discrimination were performed with malice and reckless indifference to Mr. Borumand's protected civil rights.

48.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand suffered emotional harm, embarrassment, pain and suffering, humiliation and harm to his reputation.

49.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand has suffered and continues to suffer substantial losses of past and future earnings, and other benefits associated with his former employment.

### FOURTH CLAIM FOR RELIEF

#### (Religious Discrimination In Violation Of Title VII)

50.    Plaintiff hereby realleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 49 above.

51.    Defendants intentionally discriminated against Mr. Borumand on account of his religion in violation of Title VII and The Civil Rights Act of 1991, by denying him equal terms and conditions of employment and by terminating his employment.

52.    Defendants' acts of discrimination were performed with malice and reckless indifference to Mr. Borumand's protected civil rights.

53.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand suffered emotional harm, embarrassment, pain and suffering, humiliation and harm to his reputation.

54.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand has suffered and continues to suffer substantial losses of past and future earnings, and other benefits associated with his former employment.

## FIFTH CLAIM FOR RELIEF

### (Religious Discrimination In Violation Of The NYSHRL)

55.     Plaintiff hereby realleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 54 above.

56.     Defendants intentionally discriminated against Mr. Borumand on account of his religion in violation of NYSHRL, §296(1)(a), by denying him equal terms and conditions of employment and by terminating his employment.

57.     As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand suffered emotional harm, embarrassment, pain and suffering, humiliation and harm to his reputation.

58.     As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand has suffered and continues to suffer substantial losses of past and future earnings, and other benefits associated with his former employment.

## SIXTH CLAIM FOR RELIEF

### (Religious Discrimination In Violation Of The NYCHRL)

59.     Plaintiff hereby realleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 58 above.

60.     Defendants intentionally discriminated against Mr. Borumand on account of his religion in violation of NYCHRL, §§8-107 *et seq.*, by denying him equal terms and conditions of employment and by terminating his employment.

61.     Defendants' acts of discrimination were performed with malice and reckless indifference to Mr. Borumand's protected civil rights.

62.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand suffered emotional harm, embarrassment, pain and suffering, humiliation and harm to his reputation.

63.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand has suffered and continues to suffer substantial losses of past and future earnings, and other benefits associated with his former employment.

**SEVENTH CLAIM FOR RELIEF**

**(Retaliation In Violation Of Title VII)**

64.    Plaintiff hereby realleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 63 above.

65.    Defendants intentionally discriminated against Mr. Borumand by retaliating against him for his complaints of discriminatory treatment in violation of Title VII and The Civil Rights Act of 1991. Such retaliation took the form of harassment and ultimately the termination of his employment.

66.    Defendants' acts of discrimination were performed with malice and reckless indifference to Mr. Borumand's protected civil rights.

67.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand suffered emotional harm, embarrassment, pain and suffering, humiliation and harm to his reputation.

68.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand has suffered and continues to suffer substantial losses of past and future earnings, and other benefits associated with his former employment.

## EIGHTH CLAIM FOR RELIEF

### (Retaliation In Violation Of The NYSHRL)

69.     Plaintiff hereby realleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 68 above.

70.     Defendants intentionally discriminated against Mr. Borumand by retaliating against him for his complaints of discriminatory treatment in violation of NYSHRL, §296(1)(e). Such retaliation took the form of harassment and ultimately the termination of his employment.

71.     As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand suffered emotional harm, embarrassment, pain and suffering, humiliation and harm to his reputation.

72.     As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand has suffered and continues to suffer substantial losses of past and future earnings, and other benefits associated with his former employment.

## NINTH CLAIM FOR RELIEF

### (Retaliation In Violation Of The NYCHRL)

73.     Plaintiff hereby realleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 72 above.

74.     Defendants intentionally discriminated against Mr. Borumand by retaliating against him for his complaints of discriminatory treatment in violation of NYCHRL, §8-107 *et seq.*  Such retaliation took the form of harassment and ultimately the termination of his employment.

75.     Defendants' acts of discrimination were performed with malice and reckless indifference to Mr. Borumand's protected civil rights.

76.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand suffered emotional harm, embarrassment, pain and suffering, humiliation and harm to his reputation.

77.    As a proximate result of defendants' acts of unlawful discrimination, Mr. Borumand has suffered and continues to suffer substantial losses of past and future earnings, and other benefits associated with his former employment.

### JURY DEMAND

78.    Plaintiff demands a jury on all claims stated herein.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff demands judgment as follows:

(a)    against defendants under the First, Fourth, and Seventh Claims for Relief under Title VII,

(1)    preliminarily and permanently restraining defendants from engaging in the aforementioned conduct;

(2)    awarding plaintiff back pay, prejudgment interest, and damages for all employment benefits he would have received but for the discriminatory acts and practices of defendants;

(3) awarding plaintiff reinstatement or front pay;

(4) awarding plaintiff compensatory damages;

(5) awarding plaintiff punitive damages;

(6) awarding plaintiff reasonable attorneys' fees and costs incurred in this action; and

(7) awarding plaintiff any other relief this Court deems to be just, equitable and proper; and

    (b)    against defendants under the Second, Fifth, and Eighth Claims for Relief under the NYSHRL,

    (1)  preliminarily and permanently restraining defendants from engaging in the aforementioned conduct;

    (2)  awarding plaintiff back pay, prejudgment interest, and damages for all employment benefits he would have received but for the discriminatory acts and practices of defendants;

    (3) awarding plaintiff reinstatement or front pay;

    (4) awarding plaintiff compensatory damages; and

    (5) awarding plaintiff any other relief this Court deems to be just, equitable and proper; and

    (c)    against defendants under the Third, Sixth, and Ninth, and Seventh Claims for Relief under the NYCHRL,

    (1)  preliminarily and permanently restraining defendants from engaging in the aforementioned conduct;

    (2)  awarding plaintiff back pay, prejudgment interest, and damages for all employment benefits he would have received but for the discriminatory acts and practices of defendants;

    (3) awarding plaintiff reinstatement or front pay;

    (4) awarding plaintiff compensatory damages;

(5) awarding plaintiff punitive damages;

(6) awarding plaintiff reasonable attorneys' fees and costs incurred in this action;

and

(7) awarding plaintiff any other relief this Court deems to be just, equitable and

proper.

Dated: New York, New York
     February 22, 2008

                    Respectfully Submitted,

                    LIDDLE & ROBINSON, L.L.P.

By:        _Michael E. Grenert_____

                    Michael E. Grenert (mgrenert@liddlerobinson.com)
                    Jeffrey L. Liddle (jliddle@liddlerobinson.com)
                    James R. Hubbard (jhubbard@liddlerobinson.com)
                    800 Third Avenue
                    New York, New York 10022
                    (212) 687-8500

                    MANGO & IACOVIELLO, LLP
                    Anthony G. Mango (amango@mandilaw.com)
                    14 Penn Plaza, Suite 2200
                    New York, New York 10122
                    (212) 695-5454

                    Attorneys for Plaintiff Majid Borumand

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2008, a true and correct copy of the foregoing

Amended Complaint was served by first-class mail on the following counsel of record:

Edward Cerasia II, Esq.
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York  10178
Attorneys for Defendant

Michael J. O'Brien, Esq.
Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, New York 10004
Attorneys for Plaintiff

Michael E. Grenert
—————————————————
Michael E. Grenert

Exhibit 1

CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | 520-2006-00075 |
| x | EEOC | |

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Majid Borumand | 212-204-7311 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 310 E. 46th Street, Apt. 22L, New York, New York 10017 | 12/16/61 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Merrill Lynch & Co., Inc. | 50,000+ | 609-274-6855 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 1600 Merrill Lynch Drive, Pennington, New Jersey 08534 | Mercer |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

| | RACE | | COLOR | | SEX | X | RELIGION | | AGE |
|---|---|---|---|---|---|---|---|---|---|
| X | RETALIATION | X | NATIONAL ORIGIN | | DISABILITY | | OTHER | | |

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)    LATEST
08/01/05

| | CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*


SEE ATTACHED AFFIDAVIT OF CHARGING PARTY MAJID BORUMAND


JAN 0 6 2006

EEOC-NYDO-ENFORCEMENT

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | |
| Date _____ Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) 04/01/06 |
| | ANTHONY G. MANGO Notary Public, State of New York No. 02MA5025980 |

### AFFIDAVIT OF CHARGING PARTY MAJID BORUMAND

STATE OF NEW YORK    )
                     )
COUNTY OF NEW YORK )    ss.:



MAJID BORUMAND, being duly sworn, deposes and says:

1.      I am a forty-three (43) year old male Iranian National.  I worked for Merrill Lynch

& Co., Inc. ("Merrill") as a Vice President in the Global Markets division from my hiring, in

March 2002, through my termination as of August 1, 2005.  I worked at Merrill's offices located

at 3 World Financial Center, located in New York City, New York.  For the reasons set forth

herein, I believe that my termination was motivated by unlawful discrimination based upon my

religion and national origin, as well as retaliation against my prior complaints of discrimination.

2.      I hold a PhD in Theoretical Physics and a Masters Degree in Mathematical

Finance.  I was hired by Mr. Kishor Laud to work in Merrill's Global Markets division as a Vice

President performing the function of a Quantitative Analyst (Quant).  Initially, I was placed in a

group consisting of three (3) employees, including myself, Ms. Olga Lubovitsky and Mr. Jack

Luo, all of whom had doctorate degrees.  After approximately 18 months, Ms Lubovitsky moved

to the Fixed Income division of the firm assuming a Quant role for a higher salary. Shortly after

that, Mr. James Gatheral, a Managing Director and the head of the Quantitative Analyst group

(hereinafter referred to as "Group B"), decided to merge his group with Mr. Laud's group

(hereinafter referred to as "Group A"). As a result, Mr. Laud and Mr. Luo joined group B and I

was left behind as the only surviving Quant with a PhD degree in Group A, a group that was not

well defined at this point due to the departures of Lubovitsky, Laud, and Luo.  Indeed, the only

reason for its existence at this point was to bar me from joining the Gatheral group (Group B).

3.    The decision by management to leave me behind in Group A was purely for the purpose of "justifying" a lower pay scale for me, since I did not perform any work within Group A, but rather, worked as a Quantitative Analyst with other Quantitative Analysts in "Group B". Simply put, I worked in Group B, exclusively attended their weekly meetings and was supervised by Managers within Group B, but was paid out of Group A and listed in Merrill's headcount rolls in Group A. This was a classic case of form over substance, solely motivated by discrimination against my religion and nationality.

4.    Throughout my tenure at Merrill, I complained about my continued placement in Group A, which had the effect of reducing my income by substantial margins. Over the course of my three (3) year employment at Merrill, this disparity in income was on average more than $120,000.00 per year. However, despite my verbal and written complaints about this discriminatory treatment, nothing was done to rectify the situation.

5.    Although I was a Quantitative Analyst (a "Quant"), and performed work for the traders in the Global Markets division, I was prohibited from sitting on the trading floor with my peers – the other Quants in Group B. In fact, I was the sole Quant responsible for the development of software and financial mathematics of the convertible bond model, including the support of its clients (convertible bond trading desk), yet I was forced to sit on the ninth floor, which housed the municipal bond trading desk, while the convertible bond traders and other Quants were sitting on the fifth floor of the building.

6.    Although I questioned this senseless seating arrangement time and time again, I was ignored and eventually retaliated against by being terminated. This 'isolation' created an impasse which directly affected my prospects for career advancement, since I did not have the

valuable 'face time' with the traders and other employees that is needed for advancement in the field. Indeed, although I reported only to managers in Group B, attended weekly meetings of Group B only, was included primarily in Group B's email alias (GED_MODELDEV) and had my performance evaluated out of Group B, nevertheless I was the only Quant not permitted to sit on the trading floor with my peers in Group B, and the only Quant with a PhD degree in Group B that was paid from outside of the group. There I was sitting on a different trading floor (municipal bonds), in isolation (a prelude to my termination) next to a *contract* employee with only a *high school degree* who was exclusively performing IT tasks, along with other employees who were providing PC support for the Municipal bonds group. This outrageous arrangement was simply intended to physically isolate me from my clients and the rest of my peers and in anticipation of my future termination.

7.      The unreasonable rules and restrictions placed upon me by management at Merrill were motivated by unlawful discrimination against my religion and national origin, which manifested itself on several occasions in the form of derogatory comments directed at me.

8.      James Gatheral, a Managing Director at Merrill and my manager for most of my tenure there, at one point asked me, "Majid, how can we trust you?" "How do we know that you are a nice guy – maybe you read the Koran and get ideas?" On another occasion, Mr. Gatheral was hypothetically discussing who could be cut from the group, if necessary, and he stated the following in the weekly Quant group meetings (Group B): "Quants are like Israelis and Traders are like Palestinians. There are just so many Palestinians, but Israelis are limited. We cannot afford losing Quants compared to Traders in the same way that we cannot afford losing Israelis compared to Palestinians."

9.      On another occasion, with respect to my ban from the trading floor, I was told,

"the reason you are not allowed on the trading floor is because you are from a country that has a high risk factor and is a threat." I was also told by Kishor Laud not to walk around the trading floor (5th floor), since "people get scared nowadays."

10.    On other occasions, I was told that I was under "scrutiny," because of my national origin, and I overhead two colleagues stating that there was "sensitivity" with regard to my employment at Merrill.

11.    On one occasion I was threatened that the "FBI will have you deported" and was asked whether I was "planning to bomb an airplane."

12.    These examples highlight the culture of bigotry within the division in which I worked while at Merrill. It is worth noting that I was the only Iranian and the only Muslim in the group, and I was ostracized because of this reality.

13.    In addition to the obvious manifestation of discrimination in the form of derogatory comments directed at me, I was also subjected to more subtle forms of discrimination, which had the effect of holding me back from advancing in my career. For example, the direct discriminatory policy of prohibiting me from sitting on the trading floor with my peers impacted on my ability to build relationships with clients of the firm and gain valuable 'face time' with the traders, both of which are vitally important to succeed in my field.

14.    Despite my complaints of discriminatory treatment to management at Merrill, more specifically to Kishor Laud, nothing was done to rectify the issues. In fact, the culture within my group at Merrill only fostered the discrimination, from the top on down. The situation actually deteriorated during my last three (3) months of employment, while I was under the supervision of Yonathan Epelbaum, who succeeded James Gatheral as head of Group B.

15.    Mr. Epelbaum, an Israeli National, severed the lines of communication, refusing

to directly address me let alone speak with me. At our weekly Group B Quant meetings, during which everyone would present their reports, Mr. Epelbaum would proceed around the table in alphabetic order. However, I was always the last one Mr. Epelbaum would hear from even though neither my first or last name would fall in that order. There was no justifiable reason for this treatment other than discrimination. It was humiliating.

16.     On occasions when I would complain to my direct managers, Kishor Laud and Jining Han, their advice to me was "you're barking up the wrong tree – talk to Yoni [Epelbaum]." However, despite numerous emails and telephone calls to Mr. Epelbaum, he refused to speak with me. It was no coincidence that just three (3) months after Epelbaum assumed the Managing Director duties of the group from James Gatheral, I was terminated, effective August 1, 2005.

17.     On or about June 25, 2005, I was informed by Sue Ann Hannigan, the Director of Human Resources at Merrill that I was terminated due to my position being "eliminated." I was also told that my termination had "nothing to do with my performance," but that I was an unfortunate victim of a reduction in force at Merrill. I questioned the reduction in force theory, since I knew that Merrill was hiring at the time(Merrill hired a net of more than 2000 employees between 9/2004 and 7/2005 and many more after 7/2005), and I informed Ms. Hannigan that I believed my termination was due to unlawful discrimination based on my national origin and religion. I also quoted to her the statements made by Mr. Gatheral and the others indicating suspicion towards me. At one point Ms. Hannigan became visibly upset and mentioned she has spent most of her career stopping these things from happening and stated that I could "sue Merrill" if I believed this to be the case.

18.     Since my termination from Merrill, I have reason to believe that Merrill has

retaliated against me, by providing poor references of my performance to prospective employers.

This unlawful retaliation has further stymied my efforts to continue with my career with a

different employer.

_____

Majid Borumand

Sworn to and subscribed to before
me this ___4th___ day of  January, 2006

_____

Notary Public

ANTHONY G. MANGO
Notary Public, State of New York
No. 02MA5025980
Qualified in Nassau County
Commission Expires April 4, 20 2006

Exhibit 2



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
New York District Office

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
Phone: (212) 336-3620
General Fax: (212) 336-3625
TTY: (212) 336-3622

EEOC Charge #520-2006-00075
*Majid Borumand v. Merrill Lynch & Co., Inc.*

Majid Borumand
310 East 46th Street, Apt. #22L
New York, NY 10017

Anthony G. Mango, Esq.                    Charging Party's Attorney
MANGO & IACOVIELLO
The Pennsylvania Building
14 Penn Plaza, Suite 2200
New York, NY 10122

Merrill Lynch & Co., Inc.                   Respondent
Michele C. Meyer-Shipp, Esq.
1600 Merrill Lynch Drive, 1st Floor
Pennington, NJ 08534

## DETERMINATION

Under the authority vested in me by the Commission, I issue the following determination as to the merits of the above cited charge filed under Title VII of the Civil Rights Act of 1964, as amended.

All requirements for coverage have been met. Charging Party alleges that he was discriminated against based on his religion (Muslim), his national origin (Iranian) and retaliation.

Specifically, Charging Party alleges that he was employed by Respondent as a vice president quantitative analyst at Respondent's New York City location in its global markets division. Charging Party alleges during his employment with Respondent, he was paid less and treated differently than other similarly situated individuals; that he was subjected to disparaging and derogatory statements; and, that when he complained of the discriminatory treatment, he was terminated.

Respondent denies Charging Party's allegations of employment discrimination. Respondent alleges that Charging Party was not hired as a quantitative analyst but rather a senior programmer and given a corporate title of vice president. Respondent alleges that Charging Party was not employed in its global markets division but rather its global equity technology group and that he worked in the technology group. Respondent alleges that Charging Party was not hired to perform nor did he perform the functions of a quantitative analyst. Respondent alleges that Charging Party, along with other similarly situated individuals, was paid commensurate to the work that they performed. Respondent alleges that it was not aware of Charging Party's religion as no information was gathered from him to establish it. Respondent alleges that while employed, Charging Party never complained of any discriminatory treatment. R alleges that Charging Party was terminated because his position was eliminated.

Examination of the evidence obtained during the Commission's investigation supports Charging Party's allegations that he was discriminated against on the basis of his religion, race and retaliation.

Based on this analysis, I have found that Respondent subjected Charging Party to discrimination based on his race and religion and retaliated against him. Therefore, I conclude that the evidence obtained during the Commission's investigation has established a violation of Title VII of the Civil Rights Act of 1964, as amended.

Section 706(b) of Title VII requires that if the Commission determines that there is reasonable cause to believe that violations have occurred, it shall endeavor to eliminate the alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Having determined that there is reasonable cause to believe that violations have occurred, the Commission now invites the parties to join with it in a collective effort toward a just resolution of this matter. A representative of this office will be in contact with each party in the near future to begin the conciliation process.

Disclosure of information obtained by the Commission during the conciliation process will be made in accordance with the statute and Section 1601.26 of the Commission's procedural regulations.

If Respondent declines to enter into conciliation discussion, or when the Commission's representative for any other reason is unable to secure a settlement acceptable to the Commission, I will so inform the parties in writing and advise them of the court enforcement alternatives available to the Charging Party, aggrieved person, and the Commission.

On behalf of the Commission:

Spencer H. Lewis, Jr.
District Director

SEP 1 2 2006
Date

Exhibit 3

JUDGE KOELTL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

EQUAL EMPLOYMENT OPPORTUNITY          :
COMMISSION,                                             :

            Plaintiff                                        :

    v.                                                          :

MERRILL LYNCH & CO., INC.                    :

            Defendant.                                   :

----------------------------------------------------------x

07 CIV 6017

CIVIL ACTION NO.

COMPLAINT

JURY TRIAL DEMAND

RECEIVED
JUN 2 6 2007
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964, as amended, and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of national origin (Iranian) and religion (Muslim) and provide relief to Majid Borumand.   As alleged with greater particularity below, Defendant Merrill Lynch & Co., Inc., discriminated against Mr. Borumand by failing to promote him and terminating him because of his national origin, Iranian, and religion, Muslim.

## JURISDICTION AND VENUE

1.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345.  This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) and Section 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e-5(f)(1) and (3) and § 2000e-6 ("Title VII"), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a.

2.    The unlawful employment practices alleged below were and are now

being committed within the jurisdiction of the United States District Court for the Southern District of New York.

## PARTIES

3.    Plaintiff, Equal Employment Opportunity Commission ("EEOC" or "the Commission"), is an agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) of Title VII, 42 U.S.C. §§2000e-5(f)(1).

4.    At all relevant times, Defendant Merrill Lynch & Co., Inc. ("Defendant") has continuously been doing business in the State of New York and County of New York, and has had at least fifteen employees.

5.    At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce within the meaning of Section 701(b), (g), and (h) of Title VII, 42 U.S.C. §§2000e-(b), (g), and (h).

## STATEMENT OF CLAIMS

6.    More than thirty days prior to the institution of this lawsuit, Charging Party Majid Borumand filed a charge of discrimination with the Commission alleging violations of Title VII by Defendant.  All conditions precedent to the institution of this lawsuit have been fulfilled.

7.    In or around January, 2002 Respondent offered Mr. Borumand a position as a Quantitative Analyst in its Global Markets and Investments Banking's Model Development Group.

8.    In or around February, 2002 Respondent filed a I-129 Petition for a Nonimmigrant Worker on behalf of Mr. Borumand, listing his position as "VP/Quantitative Analyst." In doing so, Respondent averred that the duties of a Quantitative Analyst required, at a minimum, a Masters in Mathematics or a similar degree, and that no American was available who met the job requirements.

9.    Mr. Borumand's degrees include a Ph.D. in Theoretical Physics and a Masters in Mathematical Finance.

10.    While employed at Merrill Lynch, Mr. Borumand was subject to a number of remarks that reflected animus towards his national origin and religion, including but not limited to a comment that "Quants were like Israelis and traders were like Palestinians."

11.    While employed at Merrill Lynch, Mr. Borumand was subject to a number of remarks that reflected animus towards his national origin and religion, including but not limited to being told that "the reason that you are not allowed on the trading floor is because you are from a country which has a high risk factor and a threat."

12.    Since at least June, 2005, Defendant discriminated against Majid Borumand on the basis of his national origin, Iranian, and religion, Muslim, by refusing to promote him from Models, located at 222 Broadway, to the "Quantitative Analyst Group," located at 4 World Financial Center, and terminating him.

13.    The effect of the practices complained of above has been to deprive Mr. Borumand of equal employment opportunities and otherwise adversely affect his status as an employee because of his national origin, Iranian, and religion, Muslim.

14.    The unlawful employment practices complained of above were intentional.

3

15.     At all relevant times, Defendants have acted with malice or reckless indifference to the federally protected rights of Mr. Borumand.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A.     Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any employment practices that discriminate on the basis of national origin and religion;

B.     Order Defendant to institute and carry out policies, practices and programs that provide equal employment opportunities for all employees, regardless of national origin and religion, and that eradicate the effects of Defendant's past and present unlawful employment practices;

C.     Order Defendant to make Majid Borumand whole by providing compensation for past and future pecuniary losses in amounts to be determined at trial;

D.     Order Defendant to make Majid Borumand whole by providing compensation for non-pecuniary losses, including pain, suffering and humiliation, in amounts to be determined at trial;

E.     Order Defendants to provide punitive damages to Majid Borumand for its malicious and/or reckless conduct, in amounts to be determined at trial;

F.     Grant such further relief as the Court deems necessary and proper;

G.     Award the Commission its costs in this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its

Complaint.

Dated: June __26__, 2007                              Respectfully submitted,

                                                      Ronald S. Cooper
                                                      General Counsel

                                                      James L. Lee
                                                      Deputy General Counsel

                                                      Gwendolyn Y. Reams
                                                      Associate General Counsel

                                                      EQUAL EMPLOYMENT OPPORTUNITY
                                                        COMMISSION
                                                      1801 L Street, N.W.
                                                      Washington, D.C.  20507

                                                      Elizabeth A. Grossman, EG-2478
                                                      Regional Attorney

                                                      Lisa Sirkin
                                                      Supervisory Trial Attorney

                                                      Michael J. O'Brien, MOB-6409
                                                      Senior Trial Attorney

                                                      New York District Office
                                                      33 Whitehall St., 5th Floor
                                                      New York, NY 0004-2112
                                                      tel:          (212) 336-3694
                                                      fax:          (212) 336-3623
                                                      e-mail:       michael.obrien@eeoc.gov